Mr. *F. W. Hubbell,* for exceptants.
Mr. *B. Gerhard,* for executor.

## COMMISSIONERS OF MOYAMENSING *v.* LONG.

The jurisdiction of Courts of Equity in cases of purpresture and nuisance is unquestioned; although not frequently exercised. It is founded on the right to restrain the exercise or execution of that, from which irreparable damage to individuals, or great public injury, must necessarily arise.

Purpresture means an encroachment upon the king, as upon part of his demesne lands, or upon rights and easements held by the crown for the public. And this applies to highways, public rivers, forts, streets, public squares, bridges, quays, and other public accommodations. A purpresture may exist without being a general public nuisance. And it may be both. Of this nature are all permanent encroachments on, and occupations of any part of a public street by an owner of lands bounding thereon.

Beside the ordinary remedy by indictment, an information lies in equity to redress the grievance by way of injunction. As a general rule, the Court will not interfere finally, when a doubt exists as to the character and illegality of the act complained of, until both have been ascertained by a trial.

It was at one time supposed, that to proceedings in equity in cases of public nuisance, the Attorney-General ought to be a party; but such is now no longer the rule. If there is a special grievance arising out of a common injury, which presses more upon some particular individuals than upon others not so immediately within the influence of it, they are entitled to the interference of a Court of Equity for the protection of their private rights.

It is competent for a municipal corporation to prosecute a bill in equity, where the injury is an immediate one to the property of the corporation; as obstructions to a public highway in the municipality common to the corporators, and the citizens of the Commonwealth generally.

The ground of the jurisdiction of Courts of Equity, in cases of nuisance, is, their ability to give a more complete and perfect remedy than is attainable at law, in order to prevent irreparable mischief, to suppress oppressive and vexatious litigation.

In this case an injunction was awarded.

*Feb.* 3. THIS was a bill in equity, filed by the *Commissioners and*

*Inhabitants of the Township of Moyamensing*, against Samuel Long. The bill set forth that in the year 1818, the persons owning land, and residing in said district or township of Moyamensing, on application to the proper court, proceeded to the opening of Eleventh Street from Cedar to Federal, and that the same was declared to be a public street and highway within the corporate limits of said district and township. The bill described the courses and distances of said Eleventh Sreeet thus opened, and its width, and the building lines on and along the same, as established by law.

It then stated that Long, the respondent, was the pretended owner, and then in the possession of a lot of ground, situate on said Eleventh Street, describing the same; and that he had commenced the erection thereon of a building; the wall whereof, in front, had been laid out so as to contain three and a half inches of said Eleventh Street, and intended, or appeared to intend to carry on the front wall of said building, three and a half inches in advance of the building line of said street, and to enclose in said wall the whole three and a half inches of said Eleventh Street; that, by the erection of the wall of said building in advance of the building lines of the public street, and over them, the complainants would be materially injured, and the property of the inhabitants in the vicinity thereof greatly diminished in value, and the windows of their houses darkened, and the occupiers and tenants thereof deprived of the air and light which they had heretofore enjoyed, and the corporation debarred from the free use of said street its whole width, which they had a legal right to use, occupy, and enjoy.

The bill also stated that the complainants had applied to Long, requesting him not to proceed in erecting said wall, but that he refused to desist therefrom, and intended to build the same up to the height of three stories.

That he pretended that the soil of said parcel of ground belonged to him, and that he had the right to build upon the same, which the plaintiffs charged to the contrary, and that he had no right to build upon a public street and over the lines thereof, and thereby prevent the lines of the same from corresponding with other parts of said street.

The bill prayed that the defendant be compelled to disclose his knowledge in relation to the street; also for an injunction, restraining him from proceeding to build upon the premises of the street as described in the bill, and over the established lines of the street and highway.

To this bill the defendant filed an answer, saying that he did not know that the said street was declared a public highway, as set forth in the bill; admitted that he was erecting a building three stories high, and denied that the front wall of said building was upon said Eleventh Street, three and a half inches over the line thereof, but alleged that the building was upon the line of the street, and not in advance thereof, and that the respondent was not taking any part of the said street and public highway.

The cause was heard on bill, answer, and proofs. The evidence was clear and conclusive, that the building was three and a half inches over the line of the street, and so far on it.

The case was argued by *S. H. Reed* and *H. R. Kneass* for plaintiffs, and *W. L. Hirst* for the defendant.

The opinion of the Court was delivered by

KING, President.—This bill, which is filed by the commissioners of the incorporated district of Moyamensing, complains that, at the time of the suing out of the subpœna, the defendant was obstructing Eleventh Street, in that district, by erecting a dwelling-house on his lot bounding on said street, the front wall of which house encroached $3\frac{1}{2}$ inches thereon. The answer distinctly denies the charge, but the proofs completely establish the plaintiffs' case. The relief prayed for at the hearing, was an injunction against the further prosecution of the work. The first question raised in the case, is as to the jurisdiction of the Court over the subject-matter of dispute. The jurisdiction of Courts of Equity in cases of purpresture and nuisance, though not frequently exercised, seems undoubted. It is said to be founded on the right to restrain the exercise or the erection of that, from which irreparable damage to individuals, or great public injury, must necessarily ensue: Eden on Injunc. chap. 11, p. 259; 2 Story Equity, 201, § 921, et seq. Jeremy's Eq. Juris. book 3, ch. 2, § 1. By purpresture is meant an encroachment upon the king, either upon part of his demesne lands, or upon rights and easements held by the crown for the public, such as upon highways, public rivers, forts, streets, squares, bridges, quays, and other public accommodations. A purpresture may exist without being an actual general public nuisance, although it may be both. And of this nature would seem to be all permanent encroachments on, and occupations of any part of a public street, by an owner of land bounding thereon. Besides the ordinary remedy by indictment, an information lies in equity to redress the grievance by way

N

of injunction.   The case of the Attorney-General v. Richards, 2
Anstruther, 603, 606, is one of this kind.   There such an informa-
tion, complaining against the defendant for having erected a wharf
or quay, two docks, and other structures between high and low
water marks, in Portsmouth Harbour, near Gosport, so as to pre-
vent boats or vessels from sailing over the spot, or mooring there,
was entertained, and a decree pronounced directing the abatement
of the obstruction.   See also Attorney-General v. Johnson, 1 Wil-
son Ch. Rep. 87.   Lord Hardwicke, in Ambler, 104, mentions the
case of an information, filed by the Attorney-General, to restrain
the stopping up a highway behind the Royal Exchange.   The juris-
diction in these cases is supposed by Eden to have been maintainable
on the ground of the acts complained of being *public nuisances*, even
although not purprestures; the interposition in cases merely of pub-
lic nuisances, being by no means a modern branch of equitable juris-
diction: Eden, 262.

.   The chief objection usually urged against such an exercise of
jurisdiction by chancery, arises from the quasi criminal nature of
the grievance sought to be remedied, and the direct tendency the
entertaining such a bill must have, to deprive the party charged
of his trial by jury.   As a general rule, however, the Court will
not interfere finally, where a doubt exists as to the character and
illegality of the act complained of, until both have been ascertained
by a trial : Attorney-General v. Cleaver, 18 Ves. 218.   The mode
of obtaining a verdict in cases of this kind, where, although no doubt
exists as to the plaintiff's title, yet, where the Court wishes to be
satisfied further of the fact of the alleged nuisance, is by giving the
plaintiff an opportunity of prosecuting an indictment, and grant-
ing an injunction in the mean while, with such qualifications as will,
whatever, may be the event, be as little prejudicial as possible to
the rights of the defendant: Attorney-General v. Cleaver, 18 Ves.
211 ; Crowder v. Tinkler, 19 Ib. 617.   Where the plaintiff's title
is doubtful (Wynstanly v. Lee, 2 Swanst. 335), or, the Court is in
its conscience satisfied that the case is not one of nuisance, accord-
ing to the legal acceptation, it will not interfere even to put the
question in a course of trial :. Dick. 163 ; Attorney-General v. Nichol,
16 Ves. 341.   But, in a plain case of public nuisance, the Court
will interpose and determine the question without a trial by jury.
In the Attorney-General v. Richards, 2 Anstruther, 615, the Chief
Baron, delivering the opinion of the Court, observes on this point
as follows :  " But it is argued that the prayer of the bill being to

abate the erections as a nuisance, the Court can only consider *that question*, as alone supporting the relief prayed for; and it is contended that this Court cannot give such a decree, or, at least, not without a trial by jury; the question of nuisance being, as laid down by Lord Hale, a question of fact and not of law. *That may be, where the question is of nuisance and the evidence doubtful.* But the cases cited, and those which Lord Hale has given us, clearly prove that where the king claims and proves a right to the soil, where a purpresture and nuisance have been committed, he may have a decree to abate it." In the Attorney-General *v.* Forbes, 2 Mylne & Craig, 129, 130, Lord Cottenham said, "With respect to the question of jurisdiction, it was broadly asserted, that an application to this Court to prevent a nuisance on a *public* road was never heard of. A little research, however, would have found many such instances. Many cases might have been produced in which the Court has interfered to prevent nuisances in public rivers and public harbours." In the Attorney-General *v.* Johnson, 2 Wilson's Ch. Rep. 87, on an information of the Attorney-General at the relation of an individual, *and a bill by the relator*, the Lord Chancellor granted an injunction *ex parte*, on affidavits to restrain a purpresture in the river Thames, and it appearing that there had been no previous writ of *ad quod damnum*, and that an indictment was pending in the King's Bench against the defendant for the same act, the Lord Chancellor refused to dissolve the injunction before trial of the indictment. In the Earl of Ripon *v.* Hobart, 1 Cooper, Sel. Cas. 333, Lord Brougham remarks, that "Lord Eldon appeared at one time to think that there was no instance of an injunction to restrain a nuisance without a trial. But though this cannot now be maintained, it is clear that in other cases where there appeared a doubt, as in Chalk *v.* Wyatt, 3 Mer. 688, the injunction was said only to be granted because damages had been recovered at law." In the same case he observes, "Where the thing sought to be prohibited is in itself a nuisance, the Court will interfere to stay irreparable mischief without waiting for the result of a trial; and will, according to circumstances, direct an issue or allow an action, and, if need be, expedite the proceedings; the injunction being in the mean time continued. But where the thing sought to be restrained is not unavoidably and in itself noxious, but only something which may, according to circumstances, prove so, then the Court will refuse to interfere until the matter be tried at law,—generally by an action, though in particular cases an issue

may be directed for the satisfaction of the Court, where an action could not be framed so as to meet the question." In the United States this jurisdiction has been generally exercised by Courts of Equity. The Trustees of Watertown v. Cowen, 4 Paige, 510, is a case in which a bill was entertained to restrain the erection of a nuisance on a public square. In the Attorney-General v. Blount, 4 Hawk. Rep. (N. C.) 384, a decree for a perpetual injunction to restrain the erection of a nuisance, which would endanger the health of the town of Tarborough, was made on a bill filed by the Attorney-General and the inhabitants of the town jointly. In the Mohawk Bridge Company v. The Utica and Schenectady Railroad Company, 6 Paige, 563, the Chancellor adopts the principles on which the Court proceeds in granting or refusing relief in such cases, as laid down by Lord Brougham in Ripon v. Hobart. Again, in the Attorney-General v. The Cohoes Company, 6 Paige, 133, the Chancellor declared, that "the Court has jurisdiction to restrain any purpresture, or unauthorized appropriation of the public property for private uses, which may amount to a public nuisance, or may injuriously affect or endanger the public interests;" and he refused to dissolve an injunction granted before final hearing.

At one time an impression seems to have prevailed, that, to proceedings in equity in cases of public nuisances, the Attorney-General ought to be a party. But this idea no longer governs: If there is a special grievance arising out of a common injury, which presses more upon particular individuals than upon others not so immediately within the influence of it, they are entitled to the interference of a Court of Equity for the protection of their private rights: Eden on Injunctions, 268 (Wheeler's edition). In Spencer v. The London and Birmingham Railway, 8 Simons, 193, the Vice-Chancellor Shadwell overruled a demurrer to a bill filed by individuals for relief against an alleged public nuisance to a public street on which they owned or occupied property, access to which was intercepted by the works of the railway. "With respect to the nature of this grievance," says the Court, "all the inhabitants of Granby Mews suffer a species of *injury* quite *distinct* from that done to his majesty's subjects in general." In Sampson v. Smith, Ib. 272, the Court entertained a bill for the suppression of a public nuisance, filed by an individual, and decided that the Attorney-General was not a necessary party to such bill: Corning v. Lowere, 6 John. C. R. 439, is determined on the same principle; as is Roper v. Randolph, 7 Porter, 238, (Ala.) The doctrine that a Court of Equity

will take jurisdiction in case of a public nuisance, at the instance of a private person, where he is in imminent danger of suffering a special injury, is also admitted in the City of Georgetown v. The Alexandria Canal Company, 12 Peters, 98–9.

But a question, and one not without difficulty, presents itself in this case : to wit, whether a municipal corporation, like the plaintiffs, is competent to prosecute such a bill where the ground of relief is not an injury to the immediate corporation property, but against obstructions to a public highway in the municipality, common to the corporators and the citizens of the Commonwealth generally. Reasoning from convenience, it appears most fitting, where an encroachment is about to be made on a public highway, within the municipality, that the public authorities of the corporation should possess the right to guard the community they represent from such an evil, and for that purpose to come into the Commonwealth's Courts for aid in behalf of their constituency. Where such an encroachment is made on a principal avenue of the municipality, such, for instance, as Broadway in New York, or High Street in Philadelphia, the injury to the whole community may quite equal that of the inhabitancy of the immediate vicinage, which latter are admitted to be. competent parties to ask relief in equity against the nuisance : Sampson v. Smith, 8 Simons, 272. In whom can the authority to vindicate such rights be so well reposed, as in the chosen organs of the whole community ? The regulation of public streets ; their pitching and paving ; the prevention and removal of all obstructions to their convenient public use : are among the chief objects of all municipal corporations. For these purposes these corporations are clothed with authority to enact ordinances, punishing, with forfeitures and penalties, all occupations of public streets interfering with the free public use of them. Under these grants of authority (possessed also by these plaintiffs), our cities and towns corporate are in the continual exercise of a most useful jurisdiction. It does not seem a forced inference from such express powers given to a corporation, to hold, that, by necessary implication, they also possess the right on behalf of the-municipality to come into the Commonwealth's Courts for relief and protection when an encroachment on a public street is committed or threatened, which it is beyond their expressly granted powers to vindicate or arrest. Such a right apparently flows from the very end and object of the creation of the corporation. Such implications are not strangers to the common law. Thus it has been held, that if the king creates a corporation,

and does not give any express powers in the letters patent to make laws, yet this power is incident to the corporation and included in their incorporation; for a body politic cannot be governed without laws: 2 Bac. Abr. 9 (tit. *Corporations*).

But we are not without judicial authority recognising the competency of such a plaintiff in equity in a proceeding, having for its object the arrest and suppression of a public nuisance, established or threatened within the limits of the corporation. In 1799, in the case of The Mayor, Commonalty, and Citizens of London *v.* Bolt, 5 Vesey, Jr. 129, Lord Rosslyn granted an injunction against an individual who was storing sugars in certain old houses in London, which, owing to their want of strength, threatened, from the danger of their falling down, the inhabitants of the vicinity with injury. The idea that the corporation of London was not a competent party to the suit, from the want of a special interest affected by the nuisance, does not appear then nor since to have suggested itself to any one. The case of The Trustees of Watertown *v.* Cowen, 4 Paige, 510, was that of a bill filed by a village corporation to restrain the defendant from proceeding in the erection of a building which he had commenced, and which occupied part of a public street, called Mill street, and part of a public square, which was said to have been dedicated by the original proprietor of the village to public use. It was among other things objected, that the suit was not properly brought in the name of the corporation. The Chancellor, admitting that the usual mode of proceeding in equity to restrain the establishment of a nuisance, or other unwarrantable intrusion upon, or interference with, the rights of the public, was by information in the name of the Attorney-General, overruled the objection, considering the corporation as properly representing the inhabitants of the village. When we consider the efficacy of this jurisdiction, and the public good that may flow from its prudent and guarded exercise, in a commonwealth containing the populous and prosperous urban communities of Pennsylvania, we feel reluctant in narrowing the remedies for the infraction of public rights, so beneficially exercised by Courts of Equity over purprestures and public nuisances. The nature of this jurisdiction, the plastic manner in which its remedies can be applied to meet all the phases such cases may assume, manifest it to be among the most useful of the conservative functions of the Court. They are so well and so clearly described by Judge Story, Equity Jurisp. vol. 2, § 924, that we

cannot illustrate our views on the subject better than by quoting the section previously cited.

"The ground of jurisdiction of Courts of Equity, in cases of purpresture as well as public nuisances, undoubtedly is their ability to give a more complete and perfect remedy than is attainable at law, in order to prevent irreparable mischief, and also to suppress oppressive and vexatious litigations. In the first place, they can interpose where courts of law cannot, to *restrain* and *prevent* such nuisances, which are threatened or in progress, as well as abate those already existing. In the next place, by a perpetual injunction, the remedy is made complete throughout all future time: whereas an information or indictment at common law can only dispose of the present nuisance, and for future acts new prosecutions must be brought. In the next place, the remedial justice in equity may be prompt and immediate, before irreparable mischief is done; whereas, at law, nothing can be done, except after a trial and upon the award of judgment." It is true that, in one instance, the competency of a municipal corporation to come into a Court of Equity as an exclusive plaintiff, complaining of a purpresture committed on a navigable stream, has been questioned: Georgetown *v.* The Alexandria Canal Co., 12 Peters, 98–9. The direct question, however, in that case was, whether such a corporation, from the mere fact of its location on the banks of the river Potomac, which divided contiguous states, was the proper party to a bill, alleging that an improvement company, chartered by Congress, had made encroachment on the free navigation of the stream, in exercising the authority given to it by its charter. The free navigation of the river had been the subject of a compact between the states of Maryland and Virginia, before the cession of the District of Columbia by those states to Congress, and the sovereign authority possessed by them, antecedent to the cession passed to Congress over that part of the river, within the ceded territory, subject to the limitations of the Act of Cession. In a case so circumstanced, the question of excess of power, in the charter, would seem specially to pertain to the sovereignties conterminous to the stream, and the question of abuse of franchise, to that from which the functions of the incorporation had been derived. The agitation of such grave questions hardly seems competent in a local municipality, deriving its interest in the stream from mere contiguity. In the English cases of purprestures, committed in ports, havens, or navigable streams, the Crown was either the exclusive or a joint party in the procedure: Attorney-

General *v.* Richards, 2 Anstruther, 603–6; Attorney-General *v.* Johnson, 1 Wilson, Ch. R. 87. The actual point decided, therefore, in Georgetown *v.* Alexandria, is in harmony with principle and precedent. But some of the doctrines broached on it do not seem in entire concord with the opinions of the English and American Courts of Chancery, as expressed in the adjudications already cited and remarked upon. It may, in this connexion, be observed that neither the case of the Mayor of London *v.* Bolt, nor the case of the Trustees of Watertown *v.* Cowen, are noticed by counsel or court; most probably because the case rested on broader principles, and did not turn on the mere question whether a municipal corporation was a proper party to a proceeding, seeking to prevent the erection of a permanent nuisance in one of its public avenues. The case before us, however, arises from an encroachment on a street within the admitted limits and corporate jurisdiction of the plaintiffs, and in such a case we have, in support of our jurisdiction, the authority of the English and New York Chancery; and the question being *res nova* in Pennsylvania, and the public benefit to be derived from the jurisdiction so obvious, we think it better to follow these latter precedents, without, however, calling in question the authority of the case of Georgetown *v.* Alexandria, on the direct point decided by it.

The Act of 1836, from which our authority in the premises is derived, gives the Court the power and jurisdiction of a Court of Equity, *inter alia,* "for the prevention and restraint of acts, contrary to law, *and prejudicial to the interests of the community,* or rights of individuals." This is a grant of jurisdiction tantamount and analogous to that exercised by Courts of Equity over nuisances and trespasses, which was the jurisdiction intended to be given. There must be a decree for a perpetual injunction.